UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

WILLIAM ANTONIO AVERY                                                  PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:13cv939-FKB

DANIEL BOYD, ET AL.                                                  DEFENDANTS

OPINION AND ORDER

This cause was tried before the Court on October 30, 2013. Having considered the entire record in this matter, the Court concludes that Defendants are entitled to judgment in their favor and that this case should be dismissed with prejudice.[1]

THE CLAIM AND THE TESTIMONY

1.     Plaintiff's Case

Plaintiff William Antonio Avery claims that his Fourth Amendment right to freedom from unreasonable search and seizure was violated when Defendant Daniel Boyd, a narcotics agent with the East Mississippi Drug Task Force, pulled him over on February 4, 2010, in Lauderdale County, Mississippi. Avery also contends that his Eighth Amendment right to be free of cruel and unusual punishment was violated when he was allegedly forced to stand in the rain during the traffic stop.

Avery testified at trial, as did his wife and daughter, who was 16 years of age at the time of the stop. All three stated that on the afternoon of February 4, 2010, they were on their way to

---

[1] All parties have consented to the undersigned conducting all proceedings in this case. *See* 28 U.S.C. § 636(c)(1).

1

pick up Avery's grandson from daycare when Agent Boyd passed them in an SUV, turned around, and stopped Avery's vehicle. Avery testified that Agent Boyd, whom Avery knew to be a narcotics officer, told him that he stopped him because Avery was driving in the middle of the road. All three witnesses testified that Avery did not drive in the middle of the road on February 4, 2010. Another vehicle, also a narcotics vehicle, arrived at the scene at some point.

      Exactly what transpired next was not described consistently by Avery and his two witnesses, but it is undisputed that it was raining and that all three occupants exited the vehicle. It is also undisputed that Agent Boyd asked to search the vehicle but that Avery refused to consent. According to Avery, Agent Boyd told him that since he would not consent to a search, he would have to stand in the rain until a canine unit arrived. Further, Avery testified that Agent Boyd made all of them (Avery, his wife, and his daughter) get out of the vehicle and stand in the rain during the entire duration of the stop and that Boyd never told them to get back in their vehicle. Avery estimated that the stop lasted approximately 30 minutes.

      Avery's wife testified that the stop occurred about 4:15 or 4:30. She stated that after Agent Boyd asked to search their vehicle, he directed everyone to step out of the vehicle and told them that they would all have to stand outside until a canine unit arrived. She further testified that after they got out of the vehicle, her daughter called a relative and that an officer threatened to tase her daughter if she did not get off the phone. In her testimony, Avery's wife initially denied that Agent Boyd ever told her and her daughter to get back in their vehicle. However, she later admitted that Boyd told them to do so but claimed that this occurred at the end of the stop. Avery's wife testified that the stop lasted more than an hour and that it continued until after 5:30 and closer to 6:00, a period of 1 hour to 1 hour, 45 minutes.

Avery's daughter testified that after pulling them over, Agent Boyd "asked for my dad to step out. So we all stepped out the vehicle." After this testimony, Avery, who was proceeding *pro se*, asked his daughter whether Agent Boyd asked all of them to get out of the vehicle; she replied that he had. After they got out of the vehicle, the daughter called her great grandmother, who lived just down the road, and asked her to come to the scene. She testified that an officer threatened to tase her if she did not get off the phone. Although her parents denied that Agent Boyd told them to get back in their vehicle, Avery's daughter admitted that Agent Boyd told her to do so, but she testified that, as long as her dad was standing outside the vehicle, she was going to stand outside the vehicle also. She admitted that she refused to comply with Agent Boyd's instructions. She further testified that because she was crying and screaming while she was on the phone, her great grandmother was worried and was coming to the scene. Before her great grandmother could get there, the officers released the family.

At trial, it was undisputed that a canine unit never arrived and that Agent Boyd never searched Avery's vehicle. Rather, he simply gave Avery a warning and allowed Avery to leave without issuing a citation.

Avery introduced into evidence a transcript of an audio recording of part of the stop. The portion of the transcript on which Avery focused as supporting his claim reads as follows:

> BY AN UNIDENTIFIED SPEAKER: What'd you tell him you pulled him over for?
>
> BY MR. BOYD: Out in the middle of the road.  What you - - he was.
>
> BY AN UNIDENTIFIED SPEAKER: He was not in the middle of the road. Man, you're making that up.
>
> BY MR. BOYD:  I ain't making that up.

P-1 at pp. 6-7.

As to damages, Avery testified that he had to spend $15 to $20 on cold medicine for his daughter, who became ill as a result of the stop and standing in the rain. Avery testified that his only other damages were the violations of his constitutional rights.

2.      The Defendants' Case

Agent Boyd testified for the defense as follows. According to Boyd, Avery had previously been arrested on drug-related charges and was known to the East Mississippi Drug Task Force as a dealer. Earlier that day, the task force had been informed that Avery had received a narcotics package in the mail. On the afternoon of February 4, 2010, he and Defendant Jessie Fairchild, another narcotics agent riding with Boyd, were en route to Avery's residence to set up surveillance. Their intelligence concerning Avery had also included a description of the vehicle used by Avery to transport drugs; the vehicle driven by Avery when Boyd encountered him matched this description. After Boyd passed Avery, Avery took a right turn at a stop sign and then veered over the yellow line. Specifically, Boyd testified that half of Avery's vehicle was in the wrong lane; Agent Fairchild, the only other defense witness, corroborated this testimony. After he observed Avery driving partially in the wrong lane, Boyd turned his vehicle around and initiated the traffic stop. When Boyd asked for Avery's driver's license and told him why he had been pulled over, Avery argued with him and disputed that he had driven in the middle of the road. Avery then asked whether the stop was being recorded, and as a result, Boyd put on his body microphone when he returned to his vehicle to run Avery's driver's license and recorded the remainder of the stop. Boyd testified that approximately 1 to 1 ½ minutes elapsed from his initial conversation with Avery to the initiation of the recording.

Agent Boyd disputed the accuracy of the recording transcript. Specifically, Boyd testified that the statement, "He was not in the middle of the road. Man, you're making that up," was made not by the "UNIDENTIFIED SPEAKER," as indicated on the transcript, but instead was made by Boyd himself. Boyd identified the "UNIDENTIFIED SPEAKER" as Agent Fairchild. Boyd explained that in the statement quoted above, he (Boyd) was repeating to Fairchild what Avery had said when Boyd accused Avery of driving in the middle of the road. Defendants introduced into evidence a CD of the recording made by Agent Boyd, and the CD was played in court during trial. *See* Exhibit D-1.

Boyd denied that he asked Avery's wife and daughter to exit the vehicle. Rather, his testimony was that he repeatedly asked them to get back into the vehicle and that after Avery refused to open the vehicle's back hatch, he instructed Avery to get back into his vehicle and out of the rain.

Agent Fairchild testified that he exited his vehicle and approached Agent Boyd and Avery after the initial stop because Avery became aggressive toward Agent Boyd and was not obeying Boyd's instructions. Fairchild described the scene as "chaotic" and, at one point in his testimony, he made reference to screaming, which can be heard on the CD. It was undisputed that the person who can be heard screaming on the CD was Avery's daughter. Fairchild further testified that Avery's wife and daughter refused to comply with Agent Boyd's repeated instructions to get back in their vehicle. Fairchild stated that he threatened to tase Avery because he was being aggressive toward Agent Boyd and disobeying orders and that, after this threat, Avery calmed down.

5

When Avery refused to consent to a search of his vehicle, Boyd attempted to contact a canine unit but was unable to do so. Boyd did not search Avery's vehicle and allowed Avery to leave with simply a warning. Agent Boyd estimated that the stop lasted approximately 12 to 14 minutes, and Agent Fairchild testified that the stop lasted no more than 15 minutes. On the CD and transcript, Boyd states that he stopped recording at approximately 4:42 p.m.

### APPLICABLE LAW AND FINDINGS

1. Lauderdale County

Avery claims that Lauderdale County failed to properly train its agents. However, Avery cannot prevail against Lauderdale County unless he can demonstrate 1) that its training procedures were inadequate or that supervision was inadequate; 2) the policymaker was deliberately indifferent in adopting the training policy at issue or in supervising subordinates; and 3) that the inadequate training or supervision directly caused his injury. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000). Avery put on no proof as to any of the above-listed elements. Avery argued in closing that he complained to the Lauderdale County Sheriff about the stop and that the Sheriff had not done anything. However, Avery's argument does not approach demonstrating a failure to train. Moreover, for the reasons set out below, the Court concludes that Avery's constitutional rights were not violated.

2. The Individual Defendants

Avery claims that when he was stopped on February 4, 2010, Defendants Boyd, Fairchild, and Lea[2] violated his Fourth Amendment right to be free from unreasonable seizure.

---

[2] Avery offered no evidence against Defendant Lea, except to allege that Defendant Lea somehow assisted Boyd and Fairchild in the stop.

To prevail on his claim under 42 U.S.C. §1983, Avery must show, at a minimum, that the officers lacked probable cause for the stop.[3] *See Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) ("To ultimately prevail on his section 1983 false arrest/false imprisonment claim, [the plaintiff] must show that [the officer] did not have probable cause to arrest him."); *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional torts' of false arrest [and] unreasonable seizure . . . require a showing of no probable cause."). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of [the stop] are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000).

Agent Boyd stopped Avery for careless driving. The Mississippi careless driving statute, Miss. Code Ann. § 63-3-1213, reads, in pertinent part, as follows:

> Any person who drives any vehicle in a careless or imprudent manner, without due regard for the width, grade, curves, corner, traffic and use of the streets and highways and all other attendant circumstances is guilty of careless driving.

Miss. Code Ann. § 63-3-1213. At trial, Agent Boyd stated that prior to the stop, he saw Avery cross the center line and travel in the center of the road. He testified that half of Avery's vehicle was traveling in the wrong lane. On the CD introduced into evidence as D-1, Agent Boyd can be heard describing Avery's actions as driving "in the middle of the road." The Court finds Agent

---

[3] The Court acknowledges that a law enforcement officer may initiate a traffic stop on less than probable cause. The Fifth Circuit has stated that, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle[,]" and this "reasonable suspicion need not rise to the level of probable cause." *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)(citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Nevertheless, since the Court finds that Agent Boyd had probable cause to stop Avery, the Court will apply the probable cause standard to the initial stop in this case.

Boyd's testimony on this issue to be credible and that driving half-way in the wrong lane, as Boyd testified Avery was doing, affords probable cause to stop a motorist for careless driving under the Mississippi statute.

Avery offered the transcript of the CD to show that another officer accused Agent Boyd of fabricating probable cause for the stop. However, the CD recording shows that the transcript is incorrect, as Boyd testified. In fact, the CD recording reveals that a question posed to Boyd by the "UNIDENTIFIED SPEAKER" is not included on the transcript. Specifically, based on the CD recording itself, what was actually said by these two officers in the portion of their conversation at issue was the following:

> BY AN UNIDENTIFIED SPEAKER: What'd you tell him you pulled him over for?
>
> BY MR. BOYD: Out in the middle of the road. What you - - he was.
>
> BY AN UNIDENTIFIED SPEAKER: *What'd he say?*
>
> BY MR. BOYD: He was not in the middle of the road. Man, you're making that up. I ain't making that up.

*See* D-1 (emphasis showing the question omitted from the transcript). In short, a review of the CD recording shows that another officer did not accuse Boyd of fabricating probable cause, as contended by Avery.

Having observed the witnesses and having considered the evidence, the Court finds that Avery failed to show by a preponderance of the evidence in this case that there was no probable cause to stop him on February 4, 2010. Further, the Court finds, based on a preponderance of the credible evidence in this case, that Agent Boyd had probable cause to stop Avery for careless driving.

Avery also claims that the duration of the stop violated his Fourth Amendment right to be free from unreasonable seizure. However, the evidence submitted by Avery on this issue was contradictory and unreliable. Avery testified that the stop lasted approximately 30 minutes, whereas his wife testified that it lasted from 1 hour to 1 hour, 45 minutes.

The defense's evidence, on the other hand, was more consistent and indicates that the duration of the stop was much shorter. Agent Boyd testified that the CD recording captures all but the first 1 to 1 ½ minutes of the stop. The Court has reviewed the CD and determined that the total length of the CD recording is 10 minutes, 9 seconds. The total time period from the beginning of the CD recording to the point on the recording when Agent Boyd allowed Avery to leave the scene is 9 minutes, 10 seconds.

The Court has closely considered all evidence introduced on this issue. Based on a preponderance of the credible evidence in this case, the Court finds that the stop lasted approximately 15 minutes.

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The Court evaluates the constitutionality of the seizure under *Terry v. Ohio*, 392 U.S. 1 (1968). "Pursuant to *Terry*, . . . [c]ourts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. Having already found that Agent Boyd had probable cause to stop Avery, the Court finds that his action was justified at its inception. The Court will, therefore, next consider whether the detention after the stop was

unconstitutional under the Fourth Amendment, as claimed by Avery.[4]

The Supreme Court has stated that the "touchstone of Fourth Amendment analysis is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." *Brigham*, 382 F.3d at 507. "The Fourth Amendment is concerned with ensuring that the scope of a given *detention* is reasonable under the totality of the circumstances." *Id.* at 508 (emphasis in original). The Fifth Circuit has stated that "[t]he correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Id.* at 507. "Reasonableness, measured 'in objective terms by examining the totality of the circumstances,' 'eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the . . . inquiry.'" *Id.*

The Court finds, based on a preponderance of the evidence in this case, that numerous circumstances contributed to the length of the stop at issue. The undisputed evidence showed that, at the time of the stop, it was raining. Agent Fairchild testified that it was raining hard. In Agent Boyd's initial conversation with Avery, Avery began arguing with Boyd about whether he

---

[4] Avery also asserts an Eighth Amendment claim in this case. However, "[s]tate defendants do not incur Eighth Amendment liability unless 'the individual was being held in custody after criminal conviction.'" *Austin v. Johnson*, 328 F.3d 204, 208 (5th Cir. 2003)(quoting *Johnson v. City of Dallas*, 61 F.3d 442, 444 (5th Cir. 1995)); *see Ingraham v. Wright*, 430 U.S. 651, 669-70 (1977)(holding that the Eighth Amendment is not implicated until the state "has secured a formal adjudication of guilt in accordance with due process of law."). Accordingly, Avery has no cognizable § 1983 claim under the Eighth Amendment in relation to the subject traffic stop.

had been driving in the middle of the road, and Agent Boyd instructed Avery to get out of his vehicle. Although there is a dispute as to whether Agent Boyd instructed all occupants to do so, it is undisputed that Avery, his wife, and his daughter all got out of the vehicle. The CD recording does not contain the initial conversation between Boyd and Avery, but it reveals a heated argument taking place at the scene and Avery's daughter screaming. The CD recording confirms that Agent Boyd instructed that Avery's wife and daughter get back in their vehicle, but despite Agent Boyd's repeated instructions, Avery's daughter refused. At trial, Avery's daughter admitted that she refused to comply with Agent Boyd's instructions. The CD recording also shows that when Agent Boyd returned to his own vehicle, he instructed Avery to get back in the Avery vehicle and out of the rain.[5] The CD recording indicates that Boyd went back to Avery's vehicle approximately 5 to 6 minutes later, returned Avery's driver's license, gave him a warning, and allowed him to leave.

Based on the circumstances set forth above, the Court finds that a detention totaling approximately 15 minutes simply was not unreasonable under the Fourth Amendment.

---

[5] According to statements made by Agent Boyd on the CD recording, he could not find a ticket book after he returned to his vehicle. After asking Agent Fairchild to "[l]ook in th[e] glove box" for a ticket book, Agent Boyd stated that he was "going to call Greg and see if he's got a ticket book." P-1 at p. 8, lines 3-4, 7-8. Instead of personally placing the call, Boyd then asked Fairchild to "[c]all Greg and ask him if he's got a ticket book." P-1 at p. 8, lines 3-4, 10-11. Presumably, "Greg" refers to Agent Greg Lea, who had apparently left the scene of the stop. Based on the CD recording, it appears that "Greg" did not answer and that Boyd never could locate a ticket book. The time that Boyd and Fairchild spent trying to find a ticket book also added to the length of the stop.

Avery attempts to raise as a constitutional issue his contention that Boyd's stated basis for the stop was really a pretext in order that Boyd might search his vehicle for drugs.[6] He also argues that Boyd did not have probable cause or a reasonable suspicion to detain him while waiting on a canine unit. However, Agent Boyd's actual motive for stopping Avery is irrelevant in determining whether the stop was constitutional under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813 (1996)(holding that an officer's motives for making a traffic stop "play no role" in analyzing whether the stop violated the Fourth Amendment); *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2082 (2011)("Our unanimous opinion [in *Whren*] held that we would not look behind an objectively reasonable traffic stop to determine whether . . . a desire to investigate other potential crimes was the real motive."). And if Agent Boyd had a "reasonable suspicion to believe that criminal activity 'may be afoot,'" Boyd could constitutionally detain Avery for a reasonable time to investigate. *United States v. Arvizu*, 534 U.S. 266, 273 (2002)(quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In making "reasonable-suspicion determinations," the Supreme Court has stated that the court "must look at the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 750.

In this case, a preponderance of the evidence showed that Agents Boyd and Fairchild had been given information that Avery had received a package of narcotics in the mail and would be in possession of those drugs on February 4, 2010. That is the reason they were en route to

---

[6] Clearly, Agent Boyd wanted to search Avery's vehicle. He asked to search Avery's vehicle and told Agent Fairchild at the scene that he "wanted to search [Avery's] car." P-1 at 6, line 15. Boyd also asked Avery to lift the back hatch of his vehicle, stating that he wanted Avery to lift the hatch "so [they] won't be in this rain." P-1 at p. 5, line 9.

12

Avery's house in the first place. Agent Boyd testified that Avery had prior arrests on drug-related charges and was known to the East Mississippi Drug Task Force as someone who sold drugs. The officers also had information about the vehicle Avery used to transport drugs, and it was the same vehicle Avery was driving at the time of the stop. After stopping Avery, Boyd asked Avery for consent to search his vehicle; Avery refused; and Boyd said that Avery would have to wait while he called for a canine unit. However, Boyd was unable to get a canine unit to the scene, and after returning his driver's license, Boyd allowed Avery to leave without searching his vehicle.

Based on the above circumstances, the agents had a "reasonable suspicion" that, at the time of the stop, Avery was engaged in criminal activity other than the traffic violation, specifically, the transfer of narcotics. However, such analysis is unnecessary to decide this case. Although it is undisputed that Agent Boyd called for a canine unit, Avery failed to show by a preponderance of the evidence that Boyd's attempt to get a canine unit actually extended the stop any longer than it would have otherwise lasted. Even if Avery could have shown that some portion of this approximately 15-minute stop was attributable solely to Boyd's attempt to get a canine unit, it would not have been sufficient to constitute a Fourth Amendment violation under the facts of this case. *See, e.g., United States v. Pack*, 612 U.S. 341 (5th Cir. 2010) (detention of 33 minutes after initial traffic stop, while waiting on canine unit, did not violate Fourth Amendment, when officer had reasonable suspicion of criminal activity).

In sum, the Court finds that Agent Boyd had probable cause to stop Avery on February 4, 2010, and that the length of the stop was reasonable. Accordingly, judgment should be rendered in favor of all defendants on all of Avery's claims asserted against them.

CONCLUSION

By separate order, the Court will enter judgment in favor of the defendants and dismiss with prejudice all of the plaintiff's claims in this case.

SO ORDERED AND ADJUDGED on the 22nd day of May, 2014.

                                                  s/ F. Keith Ball
                                                  UNITED STATES MAGISTRATE JUDGE